OPINION
{¶ 1} Defendant-appellant Jason Connors-Camp appeals from his conviction and sentence for Aggravated Murder and Aggravated Robbery. He contends that the trial court erred by denying his motion to suppress physical evidence and statements. He further contends that his conviction is not supported by the evidence. Finally, his counsel also presented a brief pursuant to Andersv. California (1967), 386 U.S. 738, with regard to the issue of the ineffective assistance of trial counsel.
 {¶ 2} We conclude that the trial court did not err by denying Connors-Camp's motion to suppress evidence. We further conclude that there is evidence in the record to support Connors-Camp's conviction. We decline to address the issue of ineffective assistance of counsel. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} In August, 2003, Gary Jones was shot and killed in his apartment. Five days later, Connors-Camp was arrested at the Dayton residence of his mother, Marcia Connors. He was arrested on a warrant issued in Trotwood for Aggravated Robbery and Felonious Assault in an unrelated matter. However, at that time, he was also a suspect in the Jones shooting. Following Connors-Camp's arrest, the police conducted a warrantless search of the residence. The search revealed a pair of blood-stained jean shorts and some tennis shoes.
 {¶ 4} Connors-Camp was subsequently indicted on three counts of Aggravated Robbery, three counts of Felonious Assault and one count of Aggravated Murder. All of the counts contained a firearm specification.
 {¶ 5} Connors-Camp filed a motion to suppress. Of relevance to this appeal, he sought to suppress all evidence stemming from the search of his mother's residence, and also his statements recorded on video-tape. At the hearing on the motion the following evidence was adduced.
 {¶ 6} The State presented the testimony of Dayton Police Officer Kenneth Rondeau,
 {¶ 7} who assisted in executing the warrant for Connors-Camp. Rondeau testified that he was wearing his police uniform at the time of the arrest. He further testified that he walked to the residence door with Detective Doyle Burke and Burke knocked on the door. Rondeau testified that Burke made contact with a woman with whom he conducted a conversation. Rondeau did not hear the conversation, as he was standing a bit back from the door at that point. According to Rondeau, Connors-Camp was quickly handed over to him. Rondeau then handcuffed Connors-Camp, transported him to the Montgomery County Safety Building, and placed him in an interview room. Rondeau did not have any conversations with Connors-Camp.
 {¶ 8} Detective Christen Beane also testified at the hearing. She testified that she went to the Wesleyan Road address with Detective Burke, Detective Elzholz, Sergeant Rohrer and Rondeau. Beane testified that Burke knocked on the residence door, which was answered by Marcia Connors. According to Beane, Burke informed Ms. Connors that he had a warrant for the arrest of Jason Connors-Camp. Beane testified that Ms. Connors then indicated that her son was there and that he was "coming up the stairs." Beane testified that as the door was opened, they could see Jason ascending the stairs. She testified that "Jason came right out the door to us and Officer Rondeau handcuffed him." Beane testified that no one had a weapon pointed at Ms. Connors, and that she did not have her weapon out of its holster.
 {¶ 9} Beane testified that once Connors-Camp was taken away, Burke asked Ms. Connors whether she owned the residence and whether her son resided with her. Beane stated that Ms. Connors indicated that she was the owner and that Connors-Camp did not live with her. However, Ms. Connors did state that her son had been "down in the basement and he had been sleeping." Beane testified that Ms. Connors gave the officers permission to enter the residence, at which time Burke read and discussed the search consent form to her. Beane testified that Ms. Connors signed the form and that Ms. Connors then directed Beane and Elholz to the basement, where she "even indicated there was a mattress in the back where [Jason] had been sleeping."
 {¶ 10} Beane indicated that when she lifted the mattress, she discovered a "pair of blue jean shorts that appeared to have blood on them." Beane testified that she never heard Ms. Connors or Mr. Connors ask the officers to leave or revoke the consent to search.
 {¶ 11} Beane testified that later that same day, she and Burke met with Connors-Camp in the Safety Building interview room. Beane testified that she gave Connors-Camp a Pre-Interview Form, which she read to him, and discussed with him. She testified that he was informed of his rights under Miranda v.Arizona (1966) 384 U.S. 436. She testified that she informed him that he was being interviewed with regard to a murder. She testified that Connors-Camp indicated that he would talk to the detectives, but that he did not want to sign the form. She testified that she then signed the form and began to interview him. She testified that Connors-Camp was very cooperative. She further testified that he did not have any trouble communicating and that he did not appear intoxicated. Beane stated that Connors-Camp was not threatened or physically abused. The detectives asked Connors-Camp to consent to a video interview, and he agreed to do so.
 {¶ 12} The video-taped interview was played during the hearing. During the video, Connors-Camp admitted that he and another person had entered Jones's apartment in order to rob him. Connors-Camp claimed that Jones was shot by the other man and that he did not shoot Jones. Connors-Camp further stated that he stole Jones's gun, which he later sold for one hundred dollars.
 {¶ 13} Next, the State presented Detective Burke, who testified that he and Rondeau approached the side door of the residence, and that he knocked on the door. He testified that he had his weapon drawn, but that it was being held down by his leg so that it was "not visible to anyone, but it's readily available." Burke indicated that Ms. Connors opened the door and that he identified himself and informed her that he was there with a warrant for the arrest of her son. Burke testified that while he was speaking with Ms. Connors, her son "came walking up from the basement area." Burke then asked Connors-Camp to step out of the house, at which time he was placed under arrest. At that point, Burke holstered his gun.
 {¶ 14} Burke testified that he then told Ms. Connors that he wanted to search the residence. He testified that Ms. Connors indicated that Connors-Camp did not live there, but that he had been sleeping in the basement. According to Burke, Ms. Connors stated that she "had no problem with us looking in the residence, [and that she] would show us where she had been sleeping." At that point, Burke indicated that he presented Ms. Connors with a consent to search form, which he read to her. Burke testified that Ms. Connors signed the form in his presence. He further testified that Ms. Connors then directed Beane and Elzholz to the basement area while he went outside to deal with the arrest. According to Burke, he then proceeded downtown.
 {¶ 15} Burke testified that he and Beane later interviewed Connors-Camp. He denied threatening or physically abusing Connors-Camp. His testimony regarding the interview corroborated that of Beane.
 {¶ 16} The defense then presented the testimony of Marcia Connors, who testified that she resides at 1713 Weselyn Drive along with her two daughters, her son, Jason Connors-Camp, and her husband, Joseph. She also testified that she is a private teacher who prepares children, ages three to five, for Head Start programs. She testified that on August 23, she had let her students start a movie while she prepared their lunch. Connors testified that she went to the home's side entrance in order to get to her van and retrieve some items. She testified that when she reached the door, she noticed at least five police officers crossing her neighbor's yard with their guns drawn. Connors testified that she opened the door at which time the officers instructed her to summon her son. She testified that she was "really scared" of guns and that the officers had their guns pointed at her. She testified that she called for Connors-Camp, who was in the basement, and told him that "the detectives that had been here before are here to see you."
 {¶ 17} According to Ms. Connors, after her son came up from the basement, an officer asked to speak with her. She testified that she was concerned that her students would be scared, so she "kind of stepped down the stairs" to her basement area. Connors testified that the officer followed her, and that "the next thing [she knew] just a lot of people [were] in my basement." She testified that she continued to ask the officers what was happening, and that they just replied by asking her about her son. She further testified that the officers were, at that point, "just going through things." Connors testified that she then went back upstairs to check on her students. She also testified that the officers did not have permission to enter her home, but that they just "stepped in."
 {¶ 18} Connors testified that when she asked to see a copy of the arrest warrant for her son, an officer handed her the warrant. She testified that the officer told her to sign a paper underneath the warrant. She testified that she could not see any part of the bottom document except for the signature line. She also testified that she did not have her glasses on at that time and that she therefore did not read that document. However, she did testify that she was able to read the warrant. She testified that at the point she signed the paper the police had already been in the basement for "a little over 30 minutes," and that they had already gone through her son's room. She further testified that she did not "feel like [she] really had a choice" other than to sign the document.
 {¶ 19} Connors-Camp also testified at the suppression hearing, and indicated that he lived with his mother. He testified that he was asleep in his room in the basement when his mother told him that someone was knocking on the door. He testified that he observed the police outside the door with guns drawn and that he got dressed. Connors-Camp further testified that an officer stepped into the house and "grabbed [him] out." He further testified that his mother did not give the officers permission to enter the house.
 {¶ 20} Connors-Camp testified that after he was arrested, he was taken downtown and placed in an interview room. He testified that he remained handcuffed and that Detectives Beane and Burke began questioning him. According to Connors-Camp, he informed the detectives that he did not want to talk to them without an attorney. He testified that Detective Beane then left to get him a soda, at which time Detective Burke grabbed him around the neck and began choking him and telling him that if he did not talk, the entire "case was going to be put on [Connors-Camp]." Connors-Camp testified that he was crying and that he was "feeling intimidated, scared, worried, [and] confused." He testified that he made the video statements merely because he felt he "didn't have no choice." Finally, he testified that he was never advised of his Miranda rights.
 {¶ 21} Joseph Connors, testified that he observed "four or five people in plain clothes, men with their guns drawn." He testified that his wife opened the door, and was informed that the police had a warrant for Jason's arrest. He testified that the officers did not request permission to enter or search the basement, and that they "just barged in."
 {¶ 22} Following the suppression hearing, the trial court found that Connors-Camp knowingly, intelligently and voluntarily waived his Miranda rights and that the video-taped statements were admissible. The trial court further found that Ms. Connors had voluntarily consented to the search of her residence, and that the results of that search were admissible.
 {¶ 23} Thereafter, Connors-Camp filed a motion to sever the counts relating to the death of Jones: specifically one count of Aggravated Robbery and the count of Aggravated Murder. The motion was granted. Connors-Camp waived his right to trial by jury, and the matter was tried by the judge. Following the trial, Connors-Camp was found guilty as charged and sentenced accordingly. From his conviction and sentence, Connors-Camp appeals.
 II {¶ 24} The First Assignment of Error states as follows:
 {¶ 25} "THE TRIAL COURT ERRED IN DENYING IN PART APPELLANT'S MOTION TO SUPPRESS."
 {¶ 26} Connors-Camp contends that the trial court erred by denying his request to suppress all items related to the search of his mother's residence, and that it further erred by failing to suppress a video-tape of statements made by him to the police.
 {¶ 27} We begin with the claim that the warrantless search of the residence was improper. Connors-Camp contends that the police did not have permission to enter or search the property. He also contends that any consent given by his mother was not voluntary. Finally, he claims that even if the consent to search was valid, his mother did not have authority to consent to a search of his belongings.
 {¶ 28} A "warrantless search of a house is valid * * * if authorized by voluntary consent from a person with authority to give consent." City of Oakwood v. Idell (Nov. 21, 1997), Montgomery App. No. 16320. "A parent who owns or controls the premises in which a child resides has the right to consent to a search thereof even though such search may produce incriminating evidence against the child." Id.
 {¶ 29} The State has the burden of proving that the police had consent to conduct a search. In re Lester, Warren App. No. CA2003-04-050, 2004-Ohio-1376, ¶ 17. In order to prove consent, the State must show, by clear and convincing evidence, that the consent was voluntary and that the person who gives the consent was authorized to do so. Id.
 {¶ 30} A trial court is the trier of fact with regard to a motion to suppress evidence. State v. Retherford (1994),93 Ohio App.3d 586, 592. Thus, the trial court is in the best position to decide questions of fact and assess witness credibility. Id. A reviewing court is "bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id.
 {¶ 31} We have reviewed the evidence presented at the suppression hearing, as outlined in Part I, above. We note that there is testimony from the Connorses that would indicate that the police were never granted permission to enter the residence or to conduct a search. However, there is also competent, credible evidence presented in the testimony of the police officers to support a finding that Ms. Connors consented to the police entry and to the search. There is also credible evidence to support a finding that her consent was voluntary, and that it was neither coerced nor the product of duress.
 {¶ 32} Additionally, there is no evidence in the record to indicate that Ms. Connors did not have authority to consent to the search of the area where the shorts and shoes were found. As noted above, as the owner of the residence, she has the right to consent to a search of her child's bedroom. In this case, it is not even clear whether the mattress in which the shorts were found was in a bedroom, or whether it was merely out in an open area. Furthermore, there is evidence that would, if believed, support a finding that Connors-Camp did not reside at his mother's home. Even if he did reside there, as he claimed at the suppression hearing, there is no evidence of an agreement with his parents that his room was off limits or that he paid rent for the room. Thus, there is no indication that Connors-Camp had a proprietary interest in the area searched.
 {¶ 33} Based upon the evidence, we find that the trial court did not err in refusing to suppress evidence obtained pursuant to this search. The record fully supports the finding by the trial court that Ms. Connors voluntarily gave the detectives consent to search her home, that she was authorized to give the consent, and that she did not thereafter withdraw that consent.
 {¶ 34} We next address the claim that the trial court should have suppressed the video-taped statements made by Connors-Camp. Connors-Camps contends that the statement was not voluntary and that it was made in violation of Miranda v. Arizona (1966),384 U.S. 436. Specifically, he claims that he was never informed of his Miranda rights. He further claims that, prior to the taping, he informed the police that he wanted to speak with a lawyer, but that this request was denied. He also alleges that the detectives attacked and intimidated him, thus coercing him into making the statement.
 {¶ 35} "A trial court, in determining whether a pretrial statement is involuntary, `should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement'." Statev. McCoy, Licking App. No. 05-CA-29, 2006-Ohio-56, ¶ 54. "The same considerations apply to whether a defendant understood and voluntarily waived his or her Miranda rights." Id. Additionally, a written waiver of the right to remain silent and of the right to counsel is not necessary to establish that waiver. State v. Scott (1980), 61 Ohio St. 2d 155, 161.
 {¶ 36} Again, the testimony presented by Connors-Camp on this issue is drastically at odds with the account provided by Detectives Beane and Burke. According, to Connors-Camp, he was never advised of his rights and his statement was the result of threats and abuse. Conversely, the detectives denied the abuse and threats. They also indicated that they appropriately advised Connors-Camp of his rights.
 {¶ 37} Again, the trial court as the finder of fact is in the best position to determine the credibility of the witnesses. The trial court, in this case, determined that, "the State met its burden of demonstrating a knowing, intelligent and voluntary waiver." There is evidence to support this finding, and we therefore conclude that the trial court did not err by denying the request for suppression.
 {¶ 38} Accordingly, the First Assignment of Error is overruled.
 III {¶ 39} The Second Assignment of Error is as follows:
 {¶ 40} "THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 41} Connors-Camp contends that the evidence did not support a conviction. In support, he argues that there is no evidence that he went to Jones's apartment with the intent to commit a robbery. He further contends that there was no evidence that he actually shot Jones or that he had a purpose to kill.
 {¶ 42} When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Statev. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 43} Connors-Camp was convicted of Aggravated Robbery in violation of R.C. 2911.01(A)(1) That statute, provides, in pertinent part, as follows:
 {¶ 44} "No person, in attempting or committing a theft offense * * * shall * * * (1) have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 45} Connors-Camp contends that the evidence does not support his conviction for Aggravated Robbery, because there is no evidence that he was aware that a robbery would occur. We disagree. There is evidence, in the form of the video-taped interview, upon which the trial court could reasonably conclude that Connors-Camp committed the offense of Aggravated Robbery. Specifically, Connors-Camp admitted the intent to rob, as well as having actually taken and sold Jones's gun.
 {¶ 46} Connors-Camp was also convicted of Aggravated Murder, in violation of R.C. 2903.01(B). That statute states that "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated robbery * * *." Connors-Camp contends that this conviction cannot stand, because the State failed to prove that he had a purpose to kill Jones.
 {¶ 47} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). Furthermore, where the State proves a person's participation in planning and executing a robbery with a gun, there is sufficient evidence to support a finding of the defendant's intent to kill. In re Washington (1998),81 Ohio St.3d 337, 340.
 {¶ 48} There is no dispute in this record that Connors-Camp was present in Jones's apartment at the time of the shooting. There is also evidence demonstrating that Connors-Camp intended to rob Jones, and that he carried a gun into the apartment for that purpose. The record contains testimony from an observer that Connors-Camp's clothes and gun were bloody when he exited the apartment. Further, the detectives found bloody jean shorts belonging to Connors-Camp in the Connorses' residence. The evidence shows that the "DNA profiles recovered from [the blood on those shorts] matched that obtained from Gary Jones." Finally, the State presented the testimony of Kendra Alexander, who testified that, when she visited Connors-Camp in jail, he admitted robbing and shooting Jones.
 {¶ 49} The trial court concluded, and we agree, that there was reasonable, credible evidence upon which to base a conviction for Aggravated Murder.
 {¶ 50} The Second Assignment of Error is overruled.
 IV {¶ 51} The Third Assignment of Error provides as follows:
 {¶ 52} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 53} In this Assignment of Error, Connors-Camp sets forth an Anders brief on the issue of ineffective assistance of counsel.
 {¶ 54} This court has been presented with "several similar appeals where the counsel for the appellant presents assignments of error and includes in one of them an Anders argument."State v. Pilgrim, Greene App. No. 2001 CA 21, 2002-Ohio-397. "Anders briefs (not arguments), however, are appropriate when appellate counsel has conscientiously concluded that there are no issues to be raised that merit consideration by the appellate court." State v. Padgett (June 30, 2000), Greene App. No. 99 CA 87.
 {¶ 55} In Padgett, we stated:
 {¶ 56} "If appellate counsel determines there are any issues warranting appellate review, even if there is only one, discussion of non-meritorious issues is neither appropriate nor desirable. Were it otherwise, this court would be required to provide appellants with an opportunity to present their own pro se briefs addressing issues already determined by their appellate counsels to be devoid of merit. While this is a proper procedure in situations where counsel has decided that any appeal would be frivolous, it is not where the appellant's attorney has found an issue or issues worthy of review." Id.
 {¶ 57} For the same reasons, we decline to review the claim of ineffective assistance of trial counsel raised by Connors-Camp's counsel, with a disclaimer, pursuant to Anders v.California (1967), 386 U.S. 738, that this claim has no arguable merit. An Anders brief is only appropriate where appellate counsel deems the appeal to be wholly frivolous. Id, at 744.
 {¶ 58} The Third Assignment of Error is overruled.
 V {¶ 59} All of the assignments of error having been overruled, the judgment of the trial court is affirmed.
Wolff and Donovan, JJ., concur.