OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Candace Jefferson, filed November 28, 2007. On January 19, 2007, Jefferson was indicted on one count of possession of cocaine (100 grams but 500 grams), with a firearm specification, one count of possession of crack cocaine (5 grams but (10 grams), with a firearm specification, one count of possession of *Page 2 
heroin (1 gram but 5 grams), with a firearm specification, and one count of conspiracy to commit possession of cocaine. Jefferson pled not guilty. On April 4, 2007, Jefferson filed a motion to suppress, and a hearing was held on the motion on April 6, 2007. On May 8, 2007, Jefferson filed a Memorandum in Furtherance of Defendant's Motion to Suppress. The State filed a Memorandum in Opposition to Motion to Suppress on May 16, 2007. The trial court overruled Jefferson's motion on May 25, 2007. Jefferson then filed a motion for reconsideration, with a supporting memorandum, which the trial court overruled on July 27, 2007. Jefferson pled no contest to the two counts of possession of cocaine, and in exchange for her pleas, the State dismissed the other charges and specifications and imposed an agreed sentence of two years on each count to be served concurrently.
 {¶ 2} At the hearing on the motion to suppress, the State presented one witness, Donald Williams, a deputy for the Montgomery County Sheriff s Office who is assigned to the Organized Crime Unit. Williams testified that on September 4, 2006, he responded to a residence located at 3474 South Union Rd. in Jefferson Township at about five o'clock in the morning, having been advised by his office that "a large amount of narcotics had been found at that residence."
 {¶ 3} According to Williams, before he responded, both the Montgomery County Sheriff s Office and the City of Moraine Police Department had received calls expressing concern about the safety of a woman named Dreama Allen, and both agencies had responded to the above address where Allen was believed to be. When Williams later arrived, he testified that the responding officers from both agencies spoke with him and "advised that they met with the homeowner, Mr. Alan Askew, and he allowed them, he gave them verbal consent to search the residence to look for this female. During the search of the residence, looking for the female, which *Page 3 
they did eventually find, they found an upstairs loft of the residence. It was an open loft. * * * They said that when they went up the stairs checking for this Dreama Allen, when they got to the top of the stairs they found Candace Jefferson lying in a bed at the top of the residence, and [at] that time she was awake and she had several bags of cocaine that she'd grabbed onto in her hands. There was also a table, it was like a TV stand or some kind of table at the end of the bed, with several loaded handguns on the table and * * * numerous baggies of cocaine."
 {¶ 4} Williams said he then made contact with the homeowner, Askew. According to Williams, Askew "advised me that he already gave the officers consent to search." Williams then asked Askew to complete a Consent to Search form, and Askew complied. The form was admitted into evidence. Williams testified that he told Askew "he could stay with us every step of the way. He could call it off at any time. I did ask him about the loft. Was there any expectation of privacy. He said, no, I go up and down there all the time. The house is mine. Nobody pays rent here. I have allowed Mrs. Jefferson to stay inside the residence since it had been like six, seven months because she didn't have a job."
 {¶ 5} Williams stated that there were several other people in the residence who he and two other officers interviewed and released, except for Allen, who had a warrant for her arrest, and Jefferson, who had been placed in a sheriffs cruiser before Williams arrived. Williams testified that there were no doors or curtains around the loft, and the area was visible from the living room below. Williams said there was nothing to prevent someone from going up the steps to the loft. Williams stated that he went upstairs and recovered what he believed to be about eight ounces of cocaine at "the end of the bed on the table where the officer described them being." According to Williams, the table was in plain view, "it would be one of the first things you saw." *Page 4 
Williams also found "[t]wo loaded handguns that was also on the same table lying next to the drugs; some crack cocaine that was a separate baggie. Then we conducted a more thorough search of the room, and behind a couch found what is known as a bulletproof vest."
 {¶ 6} Williams stated that Askew was present during the search and that he did not revoke his consent. Williams described Askew as "extremely cooperative." At the conclusion of the search, Williams interviewed Jefferson. He removed her from the cruiser, placed her in the front seat of his car and removed her handcuffs. Williams read Jefferson her Miranda rights from a standard pre-interview form, and Jefferson initialed each line on the form, indicating her understanding thereof. Williams next read the waiver portion of the form, which Jefferson signed. Williams testified that he told Jefferson about the charges against her. He stated she appeared to understand, that she did not appear to be under the influence of anything, that she did not hesitate, that she did not indicate to Williams that she did not want to discuss the matter, and she did not ask for an attorney. Jefferson made incriminating statements in the course of the interview, which lasted approximately 20 — 25 minutes. Jefferson did not make a written statement. Williams stated that he never asked for Jefferson's consent to search the house, and Jefferson did not indicate that she did not want the loft to be searched. At the end of the interview, Jefferson was transported to the Montgomery County Jail.
 {¶ 7} In overruling Jefferson's motion to suppress, the trial court determined, "the officers had obtained verbal consent from the homeowner, Mr. Askew, while the defendant was upstairs in the loft sleeping. Mr. Askew had indicated that he routinely went into the loft area and had access to that open space. They properly relied on his consent and went upstairs to the loft to look for Ms. Allen. Once the officers were upstairs, they immediately observed a weapon and *Page 5 
suspected drugs out in the open. Pursuant to the plain view doctrine, the officers could seize the contraband at that point." The court concluded that Jefferson was arrested, properly read her rights by Williams and, in the absence of promises, threats or coercion, she voluntarily agreed to waive them.
 {¶ 8} Jefferson asserts one assignment of error as follows:
 {¶ 9} "THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS CONTRABAND SEARCHED AND SEIZED BY SHERIFF'S DEPUTIES FROM DEFENDANT'S RESIDENCE AND STATEMENTS MADE BASED THEREON, AND USING THE SAME TO FIND HER GUILTY OF POSSESSION OF COCAINE WITH A WEAPON SPECIFICATION."
 {¶ 10} Jefferson argues that the State failed to establish that a consensual search occurred. According to Jefferson, the loft was "Mrs. Jefferson's private area," and "there was no proof of common use of her private sleeping quarters in the loft." Jefferson avers that Askew did not have the authority to consent to a search of "a place that is in the exclusive possession of the non-consenting Defendant." Jefferson argues that she was "a tenant in her loft area." Further, she argues that "hearsay-on-hearsay alone does not meet the State's burden of proof," given its lack of reliability. Jefferson argues the "hearsay evidence invokes the Confrontation Clause," and that she was denied the opportunity to cross-examine Askew. Finally, Jefferson avers that her statements to Williams during the interview were "fruit of the poisonous entry, search."
 {¶ 11} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. *Page 6 
(Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." State v. Purser, Greene App. No. 2006 CA 14, 2007-Ohio-190, ¶ 11.
 {¶ 12} In Ohio, "[i]t is settled law that the rules of evidence and the hearsay exclusionary rule do not apply in a suppression hearing." (Internal citation omitted). State v. Bishop, Clark App. No. 2003-CA-37,2004-Ohio-6221.
 {¶ 13} "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is `per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' (Internal citations omitted). It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. (Internal citations omitted)." Schneckloth v. Bustamonte (1973), 412 U.S. 218,219, 93 S.Ct. 2041, 36 L.Ed.2d 854. "[A] search authorized by consent is wholly valid." Id., at 222. "The State has the burden of proving that the police had consent to conduct a search. (Internal citation omitted). In order to prove consent, the State must show, by clear and convincing evidence, that the consent was voluntary and that the person who gives the consent was authorized to do so." State v. Connors-Camp, Montgomery App. No. 20850, 2006-Ohio-409.
 {¶ 14} "[W]hen the prosecution seeks to justify a warrantless search by proof of *Page 7 
voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." U.S. v. Matlock (1973), 415 U.S. 164, 171, 94 S.Ct. 988,39 L.Ed.2d 242. "The authority which justifies the third-party consent does not rest upon the law of property * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id., fn. 7.
 {¶ 15} Jefferson relies in part upon Georgia v. Randolph (2006),547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208. In Randolph, the Supreme Court held that police lack authority to conduct an evidentiary search of a residence based upon the consent of a co-occupant when another physically present co-occupant unequivocally refuses to consent to the search. The Randolph majority also determined that a subsequent search of the premises would be invalid if evidence established that the police removed a co-occupant from the premises to avoid that co-occupant's contemporaneous objection to the search.
 {¶ 16} Jefferson also relies upon U.S. v. Jimenez (1st Cir. 1995), 419 F.3d 34, in which the court determined that a lessee had the authority to consent to the search of the common areas of the house and her own room, but did not have authority to permit a search of defendant's bedroom that the lessee characterized as "his space," that she was admittedly not supposed to enter and did not enter as a regular matter, and for *Page 8 
which she lacked a key.
 {¶ 17} Having reviewed the record, it is clear under the circumstances that Askew, as the sole owner of the residence, had the authority to consent to the search of his home. There is no evidence that Askew's consent was not voluntarily given; he gave oral consent to the officers who initially responded, he told Williams that he provided consent to those officers, and he signed a written consent form for Williams. Jefferson was not a paying tenant and was merely Askew's house guest. Further, Jefferson's reliance upon Randolph and Jimenez is misplaced. There was no contemporaneous refusal to consent to the search of the loft area. Jefferson was removed from the premises because she was found with contraband in her hands, not to prevent her refusal to consent to the search. Further, the scope of Askew's voluntary consent extended to the loft area, which was not a locked bedroom that Askew was not supposed to enter and could not enter, as in Jimenez. The evidence established that Askew and Jefferson had joint access to the loft, and the evidence does not support Jefferson's assertion that she enjoyed exclusive possession thereof. The loft was not a private area, and Askew told Williams that Jefferson had no expectation of privacy there, and that he routinely went into the loft. Entrance to the loft was open, and the loft was visible from the floor below. Once the officers were upstairs, and they immediately observed the contraband that was in plain view and Jefferson with drugs in her hands, they had probable cause to arrest her. As the trial court correctly noted, "[t]he defense seems to rely on the written consent that had been obtained by Det. Williams while the defendant was handcuffed in the cruiser. The Court does not need to analyze that search in so far as the arresting officers had already found the contraband upstairs in the loft. It would not have *Page 9 
mattered if the defendant had refused consent at that point in the encounter."
 {¶ 18} In support of Jefferson's argument that hearsay-on-hearsay does not meet the State's burden of proof, she directs our attention to a decision from the state of Georgia that is not on point, State v.Gay (Ga.App. 2005), 604 S.E.2d 572 (permissible scope of consent to search apartment did not encompass contents of closed backpack located inside a closet of a bedroom where defendant was sleeping and where drugs and drug paraphernalia were not in plain view.) Further, the statements made by Williams on the issue of consent demonstrate significant indicia of reliability, despite Jefferson's contrary assertions. As noted above, Williams testified that officers from two separate agencies at the scene advised him that Askew consented to the search. Askew acknowledged the consent given to first arrivers directly to Williams (which is not hearsay-on-hearsay) when Williams interviewed him, confirming what the officers reported. Finally, Askew completed the written consent form, further buttressing Williams' testimony.
 {¶ 19} We note that in response to Jefferson's Confrontation Clause argument the State argues, "Considerations of a defendant's right to confront the witnesses against him or his right to due process are considerations properly reserved for trial, not a hearing on the admissibility of evidence," citing Matlock, discussing McCray v.Illinois (1967), 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62. InMcCray, arresting officers established probable cause at a suppression hearing by testifying to out-of-court statements made by an unidentified informant. The Court noted, "When the issue is not guilt or innocence, but, as here, the question of probable cause for an arrest or search, the Illinois Supreme Court has held that police officers need not invariably be required to disclose an informant's identity if the trial judge is convinced, by evidence submitted in open court and subject to cross-examination, *Page 10 
that the officers did rely in good faith upon credible information supplied by a reliable informant." The Supreme Court refused "to hold that the Constitution somehow compels Illinois to abolish the informer's privilege from its law of evidence" based upon appellant's argument that his due process and Sixth Amendment rights had been violated. While the matter herein does not involve a testimonial privilege, we agree with the State's suggestion, based on McCray, that since Askew's statements were not offered at the suppression hearing to prove Jefferson's guilt, but rather were offered to show that the responding officers obtained Askew's voluntary consent to search his home, there was no violation of Jefferson's Sixth Amendment right to confront witnesses against her, specifically Askew. We note, Jefferson could have subpoenaed Askew herself or requested a continuance to do so.
 {¶ 20} Finally, since we have determined that the search of the loft was lawful, Jefferson's argument that her incriminating statements to Williams were the fruit of the poisonous tree fails. See State v.Benson (Jan. 23, 1991), Hamilton App. Nos. C-900069 to C-900075.
 {¶ 21} Jefferson's sole assignment of error is overruled, and the judgment of the trial court is affirmed.
WOLFF, P.J. and BROGAN, J., concur.
Copies mailed to:
Jill R. Sink
Daniel J. O'Brien
 Hon. Mary L. Wiseman *Page 1