[Cite as *State v. Strickland*, 2012-Ohio-3397.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                           :

      Plaintiff-Appellee          :          C.A. CASE NO.    24805

v.                                      :          T.C. NO.    10CR4045/2

JERRET Q. STRICKLAND                    :          (Criminal appeal from
                                                   Common Pleas Court)
      Defendant-Appellant         :

                                        :

      . . . . . . . . . .

**O P I N I O N**

Rendered on the ___27th___ day of ___July___, 2012.

      . . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

      . . . . . . . . . .

FROELICH, J.

{¶ 1} After his motion to suppress evidence was overruled, Jerret Q. Strickland pled no contest to and was found guilty of two counts of aggravated robbery and two counts of felonious assault. Strickland appeals, challenging the trial court's denial of his motion to

suppress. Specifically, he contends that the police conducted a warrantless search, without consent, of the residence at which incriminating evidence was found.

{¶ 2} Because the trial court reasonably concluded that the search was conducted with the consent of Strickland's girlfriend, who was authorized to give consent, we will affirm the judgment of the trial court.

*Procedural History*

{¶ 3} The charges against Strickland related to the beating of a man in the vicinity of Burlington Avenue and Springfield Street in Dayton in December 2010; after some police investigation at the scene, Strickland was arrested in a house nearby. Strickland was indicted on one count of aggravated robbery (deadly weapon), one count of aggravated robbery (serious physical harm), one count of felonious assault (serious physical harm), and one count of felonious assault (deadly weapon). He pled not guilty and filed a motion to suppress, which was overruled following a hearing. Strickland subsequently entered no contest pleas on all counts. The counts of aggravated robbery were merged, as were the counts of felonious assault. Strickland was sentenced to ten years for aggravated robbery and to eight years for felonious assault, to be served concurrently.

{¶ 4} Strickland raises one assignment of error on appeal, which states:

**The trial court erred in overruling Defendant's Motion to Suppress.**

{¶ 5} Strickland claims that, although two officers had consent to enter the premises at which he was found, additional officers did not have permission to enter, and that the consent to search the premises that was subsequently obtained from his girlfriend after the "illegal entry" of the additional officers did not "dissipate" the "taint of the initial

entry."

*Facts*

{¶ 6}     The evidence presented at the suppression hearing was as follows:

{¶ 7}     In the early morning hours of December 19, 2010, Dayton police officers were dispatched to the vicinity of Burlington Avenue and Springfield Street on a report of a fight.   When they arrived, the officers could not locate a disturbance, so they talked with the witnesses who had called 911.   The witnesses told the officers that "several individuals were beating another individual down the street" and directed the officers to a nearby alley. The officers saw blood in the snow, including a smear where it looked as if a person had been dragged.   They also found a "large amount" of blood around a dumpster behind 101 Springfield and a smaller amount of blood in the dumpster.    Thereafter, the officers found the victim of the beating in a nearby abandoned building; he was barely conscious and bleeding.

{¶ 8}     According to the witnesses, the perpetrators had been armed with a tire iron, a baseball bat, and possibly a rifle, and a silver car seen in the alley had been moved during or immediately after the assault.   The witnesses were able to point out the silver car to the officers, because it was then parked a short distance down Springfield Street, in front of the house at 77 Springfield.   The officers observed that there were fresh footprints in the snow outside of 77 Springfield; they "figured someone had been out there recently," and the officers wanted to talk with the individual(s).   The officers also saw a tire iron on the floorboard of the silver car.

{¶ 9}     Officers formed a perimeter around the house and knocked on the front and

side doors. When Strickland opened the side door, Officer Ronald Christoffers asked if he could talk with Strickland about the incident that occurred down the street and if he could step inside because it was "mighty cold outside." Strickland "stepped back, opened up the door," and Officer Christoffers and another officer entered the house. Christoffers asked if anyone else was in the house, whereupon Strickland led the officers to another area where they encountered Strickland's girlfriend, Tabitha, her two young children, and another woman, Danielle Day. As the two officers entered the house, they radioed to the officers around the perimeter that they were "in"; several additional officers then followed them into the house and conducted a "protective sweep." Christoffers explained that the additional officers entered because the officers knew that they were dealing with more than one suspect. Strickland and Christoffers did not specifically discuss how many additional officers, if any, could enter the house.

{¶ 10} Strickland sat in a chair nearby while Christoffers talked with Tabitha; Strickland did not speak with the officers. According to Dayton Police Officer Nathan Curley, Tabitha was "relatively calm" and "cooperative." She explained to the officers that she had been asleep and "did not know what was going on in the house," but she reported that the people the officers were looking for were in the basement. Tabitha consented to the officers' going into the basement to get the men and to search for evidence.

{¶ 11} The officers entered the basement, which was accessible through "a trap door in the back of the house." The officers found several "subjects" in the basement, as well as bloody clothing and a baseball bat with blood on it.

{¶ 12} After the search of the basement was conducted, the police officers asked

Tabitha to sign a consent to search form "to get the evidence from her basement."  It is undisputed that Tabitha's written consent to search was executed after the search had been conducted; however, according to the officers, she orally gave her permission to search before they entered the basement.

{¶ 13}    No evidence was presented about Strickland's status as an occupant of the house.    Tabitha rented the house and lived there with Strickland's children, but it is not clear from the evidence whether Strickland also lived there.   This could affect Strickland's standing to object to the search, and it was his burden to establish standing.  *Rakas v. Illinois*, 439 U.S. 128, 131, 99 S.Ct. 421, 58 L.Ed.2d 387, fn.1 (1978); *State v. Williams*, 1st Dist. Hamiltion No. C-010088, 2001 WL 1887756, * 1 (Dec. 12, 2001).   This issue was not raised by the parties and will not be addressed by this court.

{¶ 14}    Strickland did not call any witnesses at the suppression hearing.

### *Standard of Review*

{¶ 15}    Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are "'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions.'" *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of the specifically established exceptions to the warrant requirement is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Dennis*, 182 Ohio App.3d 674, 2009-Ohio-2173, 914 N.E.2d 1071, ¶ 50 (2d Dist.). The State is required

to establish, by clear and convincing evidence, that consent to the search was freely and voluntarily given. *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988); *State v. Connors-Camp*, 2d Dist. Montgomery No. 20850, 2006-Ohio-409, ¶ 29.

**{¶ 16}** "'[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' *U.S. v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1973). 'The authority which justifies the third-party consent does not rest upon the law of property * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' Id., fn. 7 ." *State v. Jefferson*, 2d Dist. Montgomery No. 22511, 2008-Ohio-2888, ¶ 14.

**{¶ 17}** "The trial court assumes the role of the trier of fact in a hearing on a motion to suppress; it must determine the credibility of the witnesses and weigh the evidence presented at the hearing." *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002 WL 63196, * 1, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). In reviewing the trial court's ruling on a motion to suppress evidence, this Court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id.* However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id.*

*Analysis*

**{¶ 18}** In a three-sentence entry, the trial court found that the testimony of the police officers was "credible" and adopted their version of events "as the operative facts to be considered by the Court." No additional reasoning was provided for the trial court's decision to overrule the motion to suppress. However, we find ample support in the record for the trial court's conclusion.

**{¶ 19}** Through his conduct, Strickland expressed his consent to letting at least two officers enter the house, and when additional officers entered to sweep the area for suspects, neither Strickland nor his girlfriend objected. Based on the officers' testimony, the entry of additional officers was not aimed at intimidating the residents of the house, but at protecting the officers in the event that several suspects were present, and the officers did have a reasonable basis to believe that several suspects (who allegedly had committed violent acts) might be present. Because Strickland and Tabitha did not object or attempt to preclude the entrance of additional officers after Strickland's initial consent, the trial court could have reasonably concluded that the additional officers also entered with Strickland's consent.

**{¶ 20}** Moreover, there is no indication in the record that any incriminating evidence against Strickland was found on the main floor of the house, where the officers initially entered and conducted a "sweep."[1] The incriminating evidence was found in the basement, and the officers only entered the basement after Tabitha had informed them of the

---

[1] Strickland's assertion in his brief that officers "observed in plain view items which were possibly used, or connected to, the assault" is misleading. According to the officers' testimony, the only item that they observed that was "connected" to the assault, prior to obtaining Tabitha's consent to search, was a tire iron, which was in the car in front of the house.

suspects' presence there and given her consent for the officers to enter the basement. Even assuming, for the sake of argument, that Strickland lived at the house and had a reasonable expectation of privacy there, Tabitha, who actually rented the house and lived there, clearly had joint access and could consent to the search of the common areas of the house, including the basement.

{¶ 21} Relying on *State v. Riviera*, 8th Dist. Cuyahoga No. 86691, 2006-Ohio-2460, Strickland correctly states that an unlawful entry into a defendant's home may taint an otherwise voluntary consent to search obtained thereafter; when a consent to search is obtained after an illegal entry, the consent is invalid unless the taint of the initial entry dissipated before the consent was given. *Id.,* citing *State v. Cooper*, 2d Dist. Montgomery No. 20845, 2005-Ohio-5781, and *United States v. Buchanan*, 904 F.2d 349, 355-356 (6th Cir.1990). However, based on the officers' testimony, the trial court reasonably rejected Strickland's assertion that the entry was illegal in this case. Therefore, dissipation of the taint was not at issue. Moreover, even if there were some question as to whether all of the officers had permission to enter the main floor of the house, any such question would not taint the search of the basement; the officers clearly had the express permission of a resident to search the basement, where the incriminating evidence was found.

{¶ 22} Strickland also claims that testimony that Tabitha signed the written consent to search form after the search of the basement had been conducted was "indicative that the search for suspects and evidence preceded consent." We disagree. Although the evidence did establish that the form was signed after the search, the evidence also

established that Tabitha gave verbal consent before the officers entered the basement. It is unclear why the officers did not get written consent before they conducted the search of the basement, but the trial court reasonably concluded that the order of events described at the hearing established consent to search the basement.

**{¶ 23}** In sum, the evidence presented at the suppression hearing did not support Strickland's version of how the search unfolded.

**{¶ 24}** The assignment of error is overruled.

### *Conclusion*

**{¶ 25}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

HALL, J., concurs.

GRADY, P.J., dissenting:

**{¶ 26}** When officers approached the residence at 77 Springfield Street, two officers went to the front door and four others stationed themselves at perimeter points outside. (T. 24). When their knock on the front door went unanswered, the two officers went to a side door.

**{¶ 27}** Officer Christoffers knocked on the side door, which was opened by Defendant Strickland. Officer Christoffers testified:

> I asked him if he minded if I stepped inside and spoke to him in
> regards to an incident that occurred at 101 Springfield Street, because it was
> mighty cold outside. At which time, he stepped back, opened up the door

and I stepped inside, followed by another officer. (Tr. 30-31).

{¶ 28} After he went inside, Officer Christoffers radioed the officers outside the house "that I was inside the house." (T. 37). The four other officers outside entered the house about three minutes later. (T. 38). When asked who gave the other officers permission to enter, Officer Christoffers acknowledged that the other four officers came inside because he was inside. (T. 37).

{¶ 29} One of the four officers who entered, Officer Patterson, testified that "[w]e were informed via radio that we had been allowed in." (T. 10). The officers then performed a protective sweep of the house. *Id.* Officer Christoffers explained that was "because they knew there was more than one suspect." (T. 40). When asked whether he knew whether Defendant had any involvement in the crime they were investigating, Officer Christoffers testified: "I had a suspicion, but no evidence." (T. 31).

{¶ 30} Another of the four officers who entered the house, Officer Curley, testified that he approached Tabitha Schiessler and Danielle Day. Tabitha, who said she lived in the house, told Officer Curley "that the people who we were looking for were in the basement." (Tr. 19). Officer Curley further testified: "I asked if the officers could go down and get those people and she said that they could." *Id.*

{¶ 31} When officers opened a trap door to the basement they discovered several persons there. After they were removed from the basement, Officer Christoffers asked Tabitha for permission to search the basement. She gave her consent. When officers searched the basement the officers found and seized a bloodied baseball bat and clothing stained with blood. (T. 12).

**{¶ 32}** Officer Patterson's belief notwithstanding, there is no basis to find that the other four officers who entered the house three minutes after Officer Christoffers went in were given any permission to enter except in connection with the permission that Strickland gave Officer Christoffers. LaFave writes:

When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent. It is thus important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity. But, the question is *not* to be determined on the basis of the subject intentions of the consenting party or the subjective interpretations of the searching officer. As the Supreme Court concluded in *Florida v. Jimeno*,[2] the standard is "that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

LaFave, Search and Seizure (4th Ed.), Section 8.1(c).

**{¶ 33}** Officer Christoffers didn't ask Strickland for permission to search the house, and Strickland didn't consent to a search. He instead consented to allowing Officer Christoffers and another officer to step inside to ask questions concerning an event at 101 Springfield Street. A typical, reasonable person in Strickland's position would not believe

---

[2] *Florida v. Jimeno*, 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

that his consent also extended to the four other officers who entered the house three minutes later.

{¶ 34} Officer Christoffers testified that the four other officers entered the house because he had gone in, and Officer Curley testified that their purpose was to perform a protective sweep of the house. Warrantless protective sweeps are searches performed incident to an arrest, when officers reasonably suspect that persons may be inside a house or other structure in which the arrest was performed and who present a threat to the arresting officers. *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960 (2d Dist.); *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612 (2d Dist.). However, no arrest had been performed when the four officers entered the house. Further, Officer Christoffers testified that at that point, and in relation to the crime that occurred shortly before at 101 Springfield Street, "I had a suspicion, but no evidence."

{¶ 35} The warrantless entry of the home by the four other officers was illegal. Any evidence derived from that illegality must be suppressed upon the accused's proper motion, unless there was some authority to search for and seize the evidence independent of the illegality. *McLemore.* The consent to search the basement that Defendant's girlfriend, Tabitha, gave the officers was voluntary, but it was not independent in place, time, or circumstance from the illegal entry of the house. Suppression of the evidence the officers seized in their search of the basement is then required under the derivative evidence rule. *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed.2d 307 (1939).

{¶ 36} I would reverse and remand the case for further proceedings in which the

physical evidence the officers seized from the house could not be used in the State's prosecution of Defendant Strickland due to the violation of his Fourth Amendment rights. The same would not apply to any statement Defendant gave the officers, suppression of which is instead governed by the Fifth Amendment. At the hearing on his motion to suppress, Defendant conceded that he had been properly Mirandized before providing a written statement to Detective Galbraith, and Defendant did not seek to suppress the statement. (T. 42). To the extent that statement incriminated Defendant in the crime that occurred at 101 Springfield Street, it would be relevant to prove Defendant's guilt and could be introduced in evidence by the State for that purpose.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Lucas W. Wilder
Hon. Mary L. Wiseman