OPINION
{¶ 1} Jeffrey Cooper appeals from his conviction and sentence following a no-contest plea to one count of aggravated robbery.
 {¶ 2} In his three assignments of error, Cooper challenges the trial court's refusal to suppress evidence seized after police entered his home and incriminating statements he made in the residence and later at the police station. In support, Cooper argues (1) that police unlawfully entered his home without a search warrant, (2) that his subsequent consent to a search was invalid because it was tainted by the unlawful entry, (3) that an incriminating statement he made in the home was the product of custodial interrogation without Miranda warnings, (4) thatMirandized incriminating statements he made at the police station were inadmissible because they were tainted by the prior illegal entry into his home, and (5) that the incriminating statements made at the police station were inadmissible for the additional reason that the waiver of his Miranda rights was not knowing, voluntary, and intelligent.
 {¶ 3} Based on the reasoning set forth below, we agree that police unlawfully entered Cooper's home after seizing him on the porch pursuant to a valid arrest warrant. As a result, we conclude that incriminating evidence seen inside the home was not admissible under the plain-view exception to the Fourth Amendment's search warrant requirement. Although we believe Cooper's consent to a search of his home shortly after the illegal entry was "voluntary," we nevertheless conclude that the consent was invalid because it resulted from exploitation of, and therefore was tainted by, the unlawful entry. Consequently, the physical evidence found inside the home was not admissible under the State's consent-to-search theory and should have been suppressed. We also agree with Cooper's argument that an incriminating statement he made inside the home should have been suppressed because it resulted from a custodial interrogation prior to the waiver of his Miranda rights. Finally, with regard to incriminating statements Cooper later made at the police station, we reject the argument that he did not knowingly, voluntarily, and intelligently waive his Miranda rights before making the statements. On the record before us, however, we cannot determine whether the incriminating statements made at the police station were impermissibly tainted by the prior unlawful entry into Cooper's home or whether the link between the statements and the unlawful entry was so attenuated that the statements were admissible despite the prior unlawful entry. Accordingly, the trial court's judgment will be reversed, and the cause will be remanded for further proceedings consistent with this opinion.
 I. Factual and Procedural Background {¶ 4} Detective Alan Miller and nine other officers arrived at Cooper's residence on the morning of May 11, 2004, with the intent to arrest him on an outstanding DUI warrant and to question him about the robbery of an area department store. The officers surrounded the house, and Miller knocked on the front door with his gun drawn. When Cooper opened the door appearing sleepy and shirtless, Miller identified himself as a police detective. He then explained that he had a warrant for Cooper's arrest and that Cooper also was a suspect in the robbery of an Elder-Beerman store. Cooper responded by allowing himself to be handcuffed. When he handcuffed Cooper, Miller was standing on the front porch, and Cooper was standing either on the porch or in the doorway. After taking Cooper into custody, Miller and the other officers put their weapons away and "stepped inside the house." Miller then placed Cooper on a couch. On a chair across from the couch, Miller observed a blue jacket. It appeared to be the same jacket Miller previously had observed being worn by the perpetrator when viewing a surveillance videotape of the robbery.
 {¶ 5} Within five minutes of entering the house and placing Cooper on the couch, Miller repeated that he was under arrest on an outstanding warrant and that he was the main suspect in the robbery of an Elder-Beerman store. In response, Cooper stated that it was a theft, not a robbery, and that it was a BB gun, not a real gun. Miller then advised Cooper of his Miranda rights, and Cooper made no other incriminating statements at that time. While Cooper was handcuffed and sitting on the couch, Miller also requested consent to search the house. Cooper agreed and signed a consent-to-search form. The ensuing search uncovered no additional incriminating evidence.
 {¶ 6} After the search was completed, Cooper was taken to the Dayton Safety Building, where Miller formally interviewed him. Prior to the interview, Miller again advised Cooper of hisMiranda rights. Cooper indicated that he understood his rights, waived them, and proceeded to make additional incriminating statements. Neither the particular questions asked by Miller nor the responses given by Cooper are part of the appellate record.
 {¶ 7} On June 17, 2004, a grand jury indicted Cooper on one count of aggravated robbery in violation of R.C. § 2911.01(A)(1). He subsequently moved to suppress all physical evidence and statements obtained by the police. During a hearing on the motion, the sole witness, detective Miller, testified consistent with the facts set forth above. The trial court overruled the motion in an oral ruling from the bench and later filed a written entry journalizing its decision. Thereafter, Cooper entered a no-contest plea to the aggravated robbery charge and received a four-year prison sentence. This timely appeal followed.
 II. Analysis {¶ 8} Cooper advances the following assignments of error on appeal:
 {¶ 9} I. "The Trial Court erred in denying Mr. Cooper's Motion to suppress evidence derived after ten detectives and police officers unlawfully entered his residence, seized allegedly incriminating property and proceeded to question him."
 {¶ 10} II. "The Trial Court erred in denying Mr. Cooper's Motion to suppress an incriminating statement allegedly made by Mr. Cooper while surrounded in his home by ten armed detectives and police officers, handcuffed and confronted with having committed a crime, all prior to being informed of his Miranda
rights."
 {¶ 11} III. "The Trial Court erred in denying Mr. Cooper's Motion to suppress allegedly incriminating statements made both before and after being informed of his Miranda rights and allegedly incriminating property seized while in the house when, due to his injured state, Mr. Cooper could not have knowingly, voluntarily and/or intelligently waived his constitutional rights."
 {¶ 12} The foregoing assignments of error challenge the trial court's refusal to suppress (1) the blue jacket discovered inside Cooper's home, (2) the incriminating statement he made inside the home about committing a theft rather than a robbery and using a BB gun rather than a real gun, and (3) the unspecified incriminating statements he then made while being interviewed at the Dayton Safety Building. When considering a motion to suppress, it is well settled that the trial court assumes the role of the trier of fact and is in the best position to resolve factual questions and evaluate the credibility of the witnesses.State v. Morgan, Montgomery App. No. 18985, 2002-Ohio-268. If the trial court's factual findings of fact are supported by competent, credible evidence, we must accept those findings. Id. However, we conduct a de novo review to determine whether the trial court properly applied the facts to the appropriate legal standard. Id.
 {¶ 13} As noted above, the relevant facts in the present case are undisputed. The arguments raised on appeal concern the trial court's legal conclusions regarding the admissibility of Cooper's blue jacket, his incriminating statement inside the home, and his incriminating statements at the Dayton Safety Building. As a means of analysis, we will address these issues in turn.
 {¶ 14} With regard to the blue jacket found on a chair inside Cooper's home, the trial court reasoned that detective Miller and the other officers lawfully were present inside the home and that the jacket was in "plain view." As a result, the trial court held that the jacket was admissible despite the lack of a search warrant for the home. Upon review, we disagree with the trial court's conclusion on this point.
 {¶ 15} In its appellate brief, the State asserts that the officers lawfully entered Cooper's home to "effectuate his arrest." The trial court appears to have reached the same conclusion, albeit without providing much explanation for this portion of its ruling. In support of its argument, the State cites our opinion in State v. Kaser (Nov. 3, 1989), Montgomery App. No. 11373. With one judge dissenting, we held in Kaser
that officers lawfully had entered the defendant's motel room without a search warrant after arresting him just outside the door. We reasoned that the warrantless entry was justified by the officers' stated concern "to ensure that they were not in danger from anyone inside the room who may have noticed what was happening and also to avoid attracting undue attention outside the room while completing the arrest formalities."
 {¶ 16} In the present case, however, detective Miller did not testify that he and the other officers entered Cooper's home because they were concerned about potential danger from others inside. Nor did Miller testify that he entered the home to avoid attracting unwanted attention in the neighborhood. In fact, Miller never offered any justification for his warrantless entry into the home after handcuffing Cooper without incident while standing on the front porch. During oral argument, the State defended the absence of any justification for the warrantless entry by pointing out that Miller was not specifically asked during the suppression hearing why he and the other officers had entered the home. It is well-settled, however, that a warrantless entry into a home is presumptively unlawful, and the State bears the burden to establish the lawfulness of such an entry. Statev. Hawkins, Greene App. No. 2002-CA-85, 2003-Ohio-1851; Statev. Pinson, Montgomery App. No. 20927, 2005-Ohio-4532. The only argument advanced by the State on appeal is that Miller and the other officers entered the home to "effect the arrest."
 {¶ 17} In our view, however, the arrest was "effected" when detective Miller handcuffed Cooper while standing on the front porch. Cooper was in custody at that time. Nothing in the record indicates that he subsequently invited the officers into the home or that he asked to retrieve a shirt prior to being taken to the Dayton Safety Building. Instead, Miller and the other officers simply "stepped into" the residence, uninvited, to talk to Cooper about the Elder-Beerman robbery. Given the absence of a search warrant or any persuasive argument by the State regarding an exception to the warrant requirement, we therefore conclude that the officers' entry into Cooper's home violated the Fourth Amendment. Cf. United States v. Albrektsen (9th Cir. 1998),151 F.3d 951, 953-954 (concluding that officers may not enter a dwelling to arrest a defendant who is capable of being seized at the door). Thus, the plain-view doctrine relied on by the trial court to find the blue jacket admissible does not apply.Hawkins, supra, at ¶ 28. The trial court erred in concluding otherwise.
 {¶ 18} The next issue for our consideration is whether the blue jacket is admissible based on the consent-to-search form signed by Cooper while in custody and sitting on a couch inside his home. In its suppression ruling, the trial court found that Cooper's consent was "voluntarily" given. Although we do not disagree with this conclusion, it does not end our inquiry. We previously have held that even though a defendant voluntarily signs a consent-to-search form, a prior illegal entry by police into the defendant's home may "taint" the consent and make any evidence obtained pursuant to it suppressible as "fruit of the poisonous tree." City of Dayton v. Lowe (Dec. 31, 1997), Montgomery App. No. 16358.
 {¶ 19} In Lowe, police officers unlawfully entered the defendant's home and, within minutes, obtained his written consent to search it and discovered evidence of a firearm violation. Upon review, we concluded that the defendant had consented to the search "voluntarily" in the ordinary sense of the word. We reasoned, however, that even though the consent was voluntary, a Fourth Amendment issue remained due to the officers' unlawful entry in the home prior to obtaining consent.[1]
In particular, we held that the consent to search was tainted by the illegal entry that had occurred just minutes earlier and without any significant intervening event. Concluding that the officers had obtained the consent through exploitation of their illegal entry, we held that the trial court should have suppressed the evidence of the firearm violation.
 {¶ 20} We are not alone in our belief that the unlawful entry into a defendant's home may taint an otherwise voluntary consent to search thereafter obtained. The U.S. Sixth Circuit Court of Appeals reached this conclusion in United States v. Buchanan
(6th Cir. 1990), 904 F.2d 349, 355-356, reasoning that when a consent to search is obtained after an illegal entry, the consent is invalid unless the taint of the initial entry dissipated before the consent was given. The question is whether the consent was "`sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" Id. at 355, quoting Brown v.Illinois (1975), 422 U.S. 590, 599. "Dissipation of the taint resulting from an illegal entry `ordinarily involves showing that there was some significant intervening time, space, or event.'" Id. at 356, quoting United States v. Vasquez (2nd Cir. 1980), 638 F.2d 507, 528; see also United States v. Lopez-Arias
(6th Cir. 2003), 344 F.3d 623, 629 (recognizing that when there is a Fourth Amendment violation, the exclusionary rule still "may operate to exclude evidence obtained as the result of a valid, voluntary consent to search"); United States v. Hotal
(9th Cir. 1998), 143 F.3d 1223, 1228 (recognizing that "[c]onsent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment").
 {¶ 21} In the present case, even if Cooper's consent to search was obtained "voluntarily" in the ordinary sense of the word, we nevertheless find that it was tainted by the illegal entry that had occurred minutes earlier. The record reflects that within five minutes of being handcuffed at gunpoint on his doorstep, Cooper was led inside and placed on a couch with a number of officers present. There he was informed for the second time that he was a suspect in the robbery of an ElderB-eerman store and was asked to consent to a search of his home. Under these circumstances, we have little difficulty concluding that Cooper's consent was invalid because it resulted from exploitation of the unlawful entry into his home. The consent was given almost immediately after the illegal entry into Cooper's home and while the illegality was continuing. Moreover, the entry into the home was a serious violation of the Fourth Amendment. See Payton v. New York (1980), 445 U.S. 573, 585 (recognizing that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). Accordingly, we hold that the blue jacket was not admissible based on the consent-to-search form signed by Cooper, and the trial court erred in failing to order the jacket suppressed.
 {¶ 22} We turn next to the incriminating statement Cooper made while handcuffed and sitting on the couch shortly after the officers entered his home. As noted above, Miller informed Cooper that he was under arrest on an outstanding warrant and that he was the main suspect in the robbery of an Elder-Beerman store. In response, Cooper stated that it was a theft, not a robbery, and that it was a BB gun, not a real gun. Even though Cooper made the statement before being advised of his Miranda rights, the trial court concluded that the statement was volunteered and not the product of a custodial interrogation.
 {¶ 23} It is well settled that an incriminating statement made by a defendant during a "custodial interrogation" is subject to suppression unless Miranda warnings are given before the statement is elicited. In the present case, the State does not dispute that Cooper was in custody inside his home. It argues, however, that the trial court correctly found no "interrogation" by Miller preceding Cooper's statement. We disagree. In RhodeIsland v. Innis (1980), 446 U.S. 291, the Supreme Court explained that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnotes omitted).
 {¶ 24} Here detective Miller first advised Cooper at the door that he had a warrant for Cooper's arrest and that Cooper was a suspect in the robbery of an Elder-Beerman store. Even if these initial words by Miller may be construed as "normally attendant to arrest and custody," we note that the officers proceeded to step inside the home and place Cooper on a couch. There, with Cooper handcuffed with "a lot" of armed officers present, Miller advised him a second time that he was under arrest on an outstanding warrant and that he was the main suspect in an Elder-Beerman robbery.
 {¶ 25} In our view, Miller should have known that the act of entering the house with up to nine other officers, placing Cooper on a couch handcuffed, and repeating that he was a suspect in the robbery of an Elder-Beerman was reasonably likely to elicit an incriminating response. Indeed, given that Miller already had told Cooper this information just minutes earlier at the door, his decision to bring Cooper inside and repeat that he was a suspect in a serious crime seems to us purposely calculated to elicit such a response. We see little other reason for Miller to step inside, sit Cooper down, and reiterate that he was a suspect in a robbery. Therefore, we conclude that Cooper's response about a theft, not a robbery and a BB gun, not a real gun was the result of a custodial interrogation without prior Miranda
warnings. Accordingly, the trial court erred in failing to suppress the incriminating statement.
 {¶ 26} The only remaining issue is whether the trial court should have suppressed Cooper's subsequent incriminating statements at the Dayton Safety Building. Cooper contends that he did not knowingly, voluntarily, and intelligently waive hisMiranda rights before making these statements. He also argues that the statements must be suppressed as "fruit of the poisonous tree" because they were tainted by the unlawful entry into his home less than an hour earlier.
 {¶ 27} Upon review, we are unpersuaded by Cooper's argument about the waiver of his Miranda rights. The record reflects that Cooper, who had a college degree, was advised of hisMiranda rights before being interviewed and that he executed a written waiver, indicating an understanding of his rights and a willingness to speak with Miller. There is evidence that Cooper had a swollen and possibly infected eye, but he declined an offer of medical attention. There is also evidence that Cooper was initially "groggy" and "slow to react" upon answering Miller's 9:30 a.m. knock on the door. In Miller's opinion, Cooper looked as if he had just awakened. We find no evidence, however, to support Cooper's claim that his condition approximately fifty minutes later at the Dayton Safety Building precluded him from making a knowing, voluntary, and intelligent waiver of hisMiranda rights. We also find no evidence of police coercion or overreaching that might render Cooper's waiver and subsequent statements involuntary. In short, the record persuades us that Cooper understood all of his Miranda rights and the consequences of waiving them and that his waiver was the product of a free and deliberate choice. Accordingly, the trial court did not err in finding a valid waiver of Cooper's Miranda rights at the Safety Building.
 {¶ 28} Finally, we turn to Cooper's argument that the unlawful entry into his home tainted the subsequent incriminating statements he made at the Safety Building, rendering them subject to suppression. To resolve this issue, it is necessary first to determine whether the incriminating statements are in some sense the product of unlawful police conduct. If a link is found between the incriminating statements and the unlawful entry into Cooper's home, it then becomes necessary to determine whether the link is so attenuated that the statements should no longer be considered tainted "fruit of the poisonous tree." See, e.g., NewYork v. Harris (1990), 495 U.S. 14, 19 (observing that "attenuation analysis is only appropriate where, as a threshold matter, courts determine that `the challenged evidence is in some sense the product of illegal governmental activity'"). The relevant question under an attenuation analysis is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v.United States (1963), 371 U.S. 471, 487-488.
 {¶ 29} On the record before us, we cannot determine whether the incriminating statements made by Cooper at the Safety Building were a product of the police officers' unlawful entry into his home. At the time of these statements, Cooper was no longer in his home surrounded by officers who were there illegally. Thus, the Fourth Amendment violation appears to have ceased before the statements were made. Moreover, we note that Cooper's statements at the Safety Building were not the product of his being in unlawful custody. His arrest and removal to the Safety Building were entirely lawful based on the DUI warrant. These facts militate against a finding that his incriminating statements there were a product of the prior unlawful entry into his home. Cf. Harris, supra, at 17-21 (holding that where police have probable cause to arrest a suspect, the exclusionary rule does not require suppression of a statement made by the suspect outside his home, even when the statement is made following an unlawful entry into the home).
 {¶ 30} It remains entirely possible, however, that detective Miller may have obtained the incriminating statements from Cooper at the Safety Building by confronting him with evidence that was illegally seized during the unlawful entry into his home (i.e., the blue jacket discussed above) and questioning him about it. If so, it certainly can be argued that Cooper's statements at the Safety Building were influenced by the seizure of tainted evidence and, thus, were a product of the illegal entry into his home. See Saltzburg, Capra Davis, Basic Criminal Procedure (3rd Ed. 2003) 313, citing United States v. Beltran (1st Cir. 1990),917 F.2d 641.
 {¶ 31} Unfortunately, the appellate record does not reveal the questions asked by detective Miller at the Safety Building or the incriminating responses given by Cooper. The content of the interview and the motivation for Cooper's statements are unknown to us. As a result, we cannot engage in the fact-specific inquiry required to determine whether Cooper's statements at the Safety Building were a product of the illegal entry into his home and, if so, whether they should have been suppressed as fruit of the illegal entry. The trial court's ruling did not address these issues, and we will leave them for the trial court to resolve on remand.
 III. Conclusion {¶ 32} Based on the reasoning set forth above, we hereby sustain Cooper's assignments of error insofar as he contends the trial court erred in failing to suppress the blue jacket discovered inside his home and the incriminating statement he made inside the home about a committing a theft rather than a robbery and using a BB gun rather than a real gun. With regard to the subsequent incriminating statements Cooper made at the Dayton Safety Building, the matter is remanded for the trial court to determine in the first instance whether those statements are admissible despite the prior illegal entry into Cooper's home.
Judgement reversed and cause remanded.
Wolff, J., and Fain, J., concur.
[1] In reaching this conclusion, we drew an analogy to Brownv. Illinois (1975), 422 U.S. 590, wherein the Supreme Court recognized that merely because a statement is "voluntary" for Fifth Amendment purposes does not mean that it was completely unaffected by a Fourth Amendment violation. Thus, in addition to being voluntary, a statement (or here a consent) must not result from exploitation of the Fourth Amendment violation. Id. at 601-604.