[Cite as *State v. LaPrairie*, 2011-Ohio-2184.]

IN THE COURT OF APPEALS OF GREENE COUNTY, OHIO

STATE OF OHIO                       :

    Plaintiff-Appellee          :      C.A. CASE NO. 2010CA-0009

vs.                                 :      T.C. CASE NO. 2009-CR-211

BRIAN LAPRAIRIE                     :      (Criminal Appeal from
                                           Common Pleas Court)
    Defendant-Appellant         :

. . . . . . . . .

O P I N I O N

Rendered on the 6th day of May, 2011.

. . . . . . . . .

Stephen K. Haller, Pros. Attorney; Elizabeth A. Ellis, Asst. Pros. Attorney, Atty. Reg. No.0074332, 61 Greene Street, Suite 200, Xenia, OH 45385
    Attorneys for Plaintiff-Appellee

Thomas M. Kollin, Atty. Reg. No.0066964, 2661 Commons Blvd., Suite 214, Beavercreek, OH 45431
    Attorney for Defendant-Appellant

. . . . . . . . .

GRADY, P.J.:

{¶ 1} Defendant, Brian LaPrairie, appeals from his convictions and sentences for involuntary manslaughter, child endangering, having weapons under disability, and trafficking in marijuana.

{¶ 2} On December 27, 2008, at approximately 10:00 a.m.,

Fairborn police officers Hiles and Knapp were dispatched to Defendant's residence at 233 Pat Lane in Fairborn on a report that a two year old child was not breathing. Upon arriving, both officers entered the residence and found the child, Juliana Berry, unconscious and lying on a couch in the living room. Both officers immediately began emergency medical procedures on the child in an attempt to revive her. Defendant was present and in a frantic state. After paramedics arrived, both officers carried the child outside to the waiting ambulance. The child was then transported to a hospital.

{¶ 3} After the ambulance left for the hospital, Officers Hiles, Knapp, and another officer who had arrived, Holcomb, reentered Defendant's residence to talk to Defendant. Officers Knapp and Holcomb spoke with Defendant, who said he and the child had got up at 9:00 a.m., ate a bowl of cereal, and then told Defendant that she vomited. While Defendant was cleaning that up, he noticed the child was on the floor, shaking. After Defendant attempted unsuccessfully to get the child to respond, he called 911. Defendant reported that the child had a seizure two days earlier, on Christmas, was fine after about one minute, but that she had hit her head on the toilet when she vomited, and that he caused bruises to the child's chest and stomach while Defendant was trying to wake her up.

{¶ 4} The officers became suspicious about the circumstances surrounding the child's injuries and called a supervisor who advised them to seek a consent to search from Defendant. While Officers Hiles and Holcomb continued talking with Defendant, Officer Knapp obtained a consent to search form from his cruiser and then reentered the residence. After reviewing the form and being told by police that he did not have to consent to a search of his home, Defendant signed the written consent to search form. Police searched Defendant's home and discovered a loaded handgun, marijuana, digital scales, and drug paraphernalia.

{¶ 5} The medical staff at the hospital determined that Juliana Berry suffered numerous inflicted injuries, including a skull fracture with swelling of the brain, retinal hemorrhages, a lacerated liver, contusions of the chest and extremities, broken ribs, and injuries to her abdomen, which were the result of severe trauma similar to a car accident and not the result of falls or playground accidents. Juliana Berry died on December 29, 2008 from injuries resulting from blunt force trauma to the head.

{¶ 6} Defendant was indicted on two counts of felonious assault, R.C. 2903.11(A)(1), one count of felony murder, R.C. 2903.02(B), one count of endangering children, R.C. 2919.22(B)(1), one count of involuntary manslaughter, R.C. 2903.04(A), one count of having weapons under a disability, R.C. 2923.13(A)(3), and one

count of trafficking in marijuana, R.C. 2925.03(A)(1). Defendant filed a motion to suppress evidence, which the trial court denied. Pursuant to a negotiated plea agreement, Defendant entered pleas of guilty to the involuntary manslaughter and endangering children charges, and pleas of no contest to the weapons under disability and trafficking in marijuana charges. In exchange, the State dismissed the felonious assault and felony murder charges. The trial court sentenced Defendant according to law to prison terms totaling twenty-two years, of which ten years is mandatory time.

{¶ 7} Defendant timely appealed to this court from his conviction and sentence.

<u>FIRST ASSIGNMENT OF ERROR</u>

{¶ 8} "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN FAILING TO FIND INVOLUNTARY MANSLAUGHTER, WITH PROXIMATE CAUSE OF CHILD ENDANGERING AND THE SAME CHILD ENDANGERING ARE ALLIED OFFENSES OF SIMILAR IMPORT AND THUS THE CONVICTIONS BE MERGED AT SENTENCING."

{¶ 9} Counts Four and Five of the indictment, to which Defendant pled guilty, state:

{¶ 10} "COUNT IV: BRIAN H. LaPRAIRIE, from February 2008 through December 27, 2008, in Greene County, Ohio, did recklessly abuse Juliana Ameena Berry, a child under 18 years of age, contrary to and in violation of Section 2919.22(B)(1) of the Ohio Revised Code,

and the violation of this section resulted in serious physical harm to Juliana Ameena Berry.  (Endangering Children, a felony of the second degree.)

{¶ 11} "COUNT V: BRIAN H. LaPRAIRIE, on or about December 29, 2008, in Greene County, Ohio, did recklessly cause the death of Juliana Ameena Berry as a proximate result of BRIAN H. LaPRAIRIE'S committing or attempting to commit a felony, to wit: Endangering Children, the elements of which are that the Defendant did recklessly abuse Juliana Ameena Berry, a child under 18 years of age, and said violation resulted in serious physical harm to Juliana Ameena Berry, all of which is contrary to and in violation of Section 2903.04(A) of the Ohio Revised Code, and against the peace and dignity of the State of Ohio.  (Involuntary Manslaughter, a felony of the first degree.)"

{¶ 12} Prior to Defendant's guilty pleas, and as part of its plea bargain agreement with Defendant, the State amended its bill of particulars to specify that the conduct forming the Endangering Children offense alleged in Count Four occurred on December 27, 2008, the date on which Julianna Berry was removed from Defendant's home and taken to the hospital, where she subsequently died on December 29, 2008.  Count Five alleged that the Involuntary Manslaughter occurred on December 29, 2008.  Nevertheless, the predicate Endangering Children felony that resulted in Juliana

Berry's death necessarily involved conduct on Defendant's part that occurred on or before December 27, 2008.

{¶ 13} At his sentencing, Defendant moved that his convictions be merged pursuant to R.C. 2941.25, which provides:

{¶ 14} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 15} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 16} Confronted with the prospect that the criminal conduct in both Count Four and Count Five occurred on December 27, 2008, and that both involved the felony offense of Endangering Children, which was the offense alleged in Count Four and the predicate offense alleged in Count Five, the State argued:

{¶ 17} "We intend to present evidence in that regard to show that, in fact, there are two separate offenses here. There is, if you will, a separate animus. The first being the injuries to the head that actually caused her death and that was the predicate

for the manslaughter, but there's also Child Endangering for other injuries that she suffered primarily to her abdomen and her chest that were serious physical injuries that occurred about the same time that will substantiate the Endangering Children.

{¶ 18} "So, in effect, what we're saying is that they're [sic] separate animus, which is one of the tests that the Supreme Court and the Courts of Appeal always look at when they determine whether or not these offenses are similar." (Tr. at 6-7.)

{¶ 19} The State offered the testimony of Dr. Lee Lehman, a forensic pathologist and the Chief Deputy Coroner of Montgomery County, who testified concerning an autopsy he performed on the body of Julianna Berry on December 29, 2008. Dr. Lehman testified that he signed Julianna Berry's death certificate, in which he opined that the cause of her death was "[b]lunt force trauma to the head due to Battered Baby Syndrome." (Id. at 6.) Dr. Lehman testified that the trauma involved "severe blows to the back of her head resulting in skull fracture, brain injury, brain swelling, cardiopulmonary arrest, a lack of oxygen, and death." (Id. at 7-8.) He further testified that the trauma involved more than three severe blows which were recent in time. (Id. at 8.)

{¶ 20} Dr. Lehman testified that Julianna Berry also suffered multiple injuries to her chest and abdomen, that the right side

of her chest bore seventeen bruise marks, and that "[u]nder the bruises are deep muscle injuries, contusions, and adjacent to that, fresh rib fractures and rib fractures that had already been broken." (Id.) Dr. Lehman further testified that "the liver is bruised and torn" and that there "are bruises to the back of her abdomen and injury to her mesentery which is – – the mesentery is in the part of the abdomen that supplies blood to the intestines." (Id. at 9.) Dr. Lehman testified that those injuries were "recent injuries," and that he based that opinion on "the lack of a healing response." (Id.)

{¶ 21} Dr. Lehman further opined that the multiple blows that caused the injuries to the child's chest and abdomen were separate and apart from the fatal blows to her head he described. (Id. at 10.) However, he could not determine when any of those injuries occurred. (Id. at 11.) Dr. Lehman stated that "[s]ome of her injuries were fresh, as I said before, that it [sic] had no healing visible, and there are injuries obviously older." (Id. at 12.) Dr. Lehman's testimony concluded with the following colloquy:

{¶ 22} "BY MR. HALLER: (Prosecuting Attorney)

{¶ 23} "Q   The injuries to the abdomen and the chest, the mesentery, the liver, is it more probable than not that those occurred about the same time as the head injuries, or was it before that?

{¶ 24} "A   They appear about the same age.   I have the disadvantage of examining her after two days in the hospital, but they appeared the same age."   (Id. at 12-13.)

{¶ 25} The trial court addressed Defendant's motion for merger and the State's arguments contra, applying the tests in *State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, and *State v. Rance* (1999), 85 Ohio St.3d 632.   The court held that Endangering Children, R.C. 2919.22(B)(1), and Involuntary Manslaughter, R.C. 2903.04(A), are not allied offenses pursuant to R.C. 2941.25(A).   The court further found that the preemptive exception to the merger of allied offenses announced in *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, applies, because in enacting the sections defining Endangering Children and Involuntary Manslaughter the General Assembly intended to protect separate societal interests.

{¶ 26} Having   found   that   Endangering   Children,   R.C. 2919.22(B)(1), and Involuntary Manslaughter, R.C. 2903.04(A), are not allied offenses per R.C. 2941.25(A), the court declined to address the State's R.C. 2941.25(B) contention that the two offenses in Counts Four and Five were committed with a separate animus.   (Tr. at 20.)   The court imposed prison terms of ten years for the Involuntary Manslaughter offense and eight years for the Endangering Children offense, to be served consecutive to each other and to a sentence of four years for the weapons under

disability offense charged in Count Six.  All three terms are to be served concurrent to the term of eighteen months imposed for the trafficking in marijuana offense in Count Seven.

{¶ 27} The judgment of conviction from which Defendant appeals was journalized on January 7, 2010.  On December 29, 2010, the Ohio Supreme Court decided *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314.  *Johnson* overruled *Rance* and held:  "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered."  Id. at syllabus.  The Supreme Court explained its holding at ¶47-51, stating:

{¶ 28} "Under R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct.  Thus, the court need not perform any hypothetical or abstract comparison of the offenses at issue in order to conclude that the offenses are subject to merger.

{¶ 29} "In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense *and* commit the other with the same conduct, not whether it is possible to commit one *without* committing the other.  *Blankenship*, 38 Ohio St.3d at 119, 526 N.E.2d 816 (Whiteside, J., concurring) ('It is not necessary that both crimes are always committed by the same conduct but, rather,

it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses.' [Emphasis sic]). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

{¶ 30} "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50 (Lanzinger, J.,dissenting).

{¶ 31} "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

{¶ 32} "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge."

{¶ 33} The defendant in Johnson was convicted of both felony murder, R.C. 2903.02(B), based upon the predicate offense of child endangering, and child endangering, R.C. 2919.22(B)(1). The Supreme Court wrote that the defendant "beat seven-year-old Milton

Baker to death", at ¶3, explaining:

{¶ 34} "Johnson was convicted of felony murder under R.C. 2903.02(B) (based upon the predicate offense of child endangering) and child endangering under R.C. 2919.22(B)(1), among other crimes. In this case, the crimes of felony murder and child endangering are allied offenses.

{¶ 35} "The offenses were based upon the following conduct. In the incident at issue, Johnson was in a room alone with Milton while the boy's mother was in a different room watching television. The mother heard Johnson yelling, heard a 'thump' or 'stomping,' and went to investigate. She found Johnson yelling at Milton for mispronouncing a word while reading, and she observed Johnson push Milton to the floor. The mother left the room. Shortly thereafter, she heard another loud 'thump' or 'stomp.' When she went to the room, she saw Milton shaking on the floor. Neighbors testified that they had heard the boy crying and heard Johnson 'whooping' the boy and yelling, 'Do you want pain? You want pain? I'll give you pain!'

{¶ 36} "Milton's death was a result of injuries sustained from blunt impact to the head. Medical experts testified as to older injuries indicative of multiple incidents of child abuse.

{¶ 37} "We agree with the court of appeals that the state relied upon the same conduct to prove child endangering under R.C.

2919.22(B)(1) and felony murder.  Although there were arguably two separate incidents of abuse, separated by time and brief intervention by Milton's mother, the state obtained a conviction for the first sequence of abuse under R.C. 2919.22(B)(3) for administering excessive physical discipline.  It was the second sequence of abuse for which the state obtained a conviction under R.C. 2919.22(B)(1) for abuse that caused serious physical harm.  And the conviction for the second sequence of events under R.C. 2919.22(B)(1) is the basis for the predicate offense of felony murder under R.C. 2903.02(B).  Thus, the two offenses were based upon the same conduct for purposes of R.C. 2941.25.  We decline the invitation of the state to parse Johnson's conduct into a blow-by-blow in order to sustain multiple convictions for the second beating.  This beating was a discrete act that resulted in the simultaneous commission of allied offenses, child abuse and felony murder.

{¶ 38} "Johnson's beating of Milton constituted child abuse under R.C. 2919.22(B)(1).[] That child abuse formed the predicate offense for the felony murder under R.C. 2903.02(B).[]  The conduct that qualified as the commission of child abuse resulted in Milton's death, thereby qualifying as the commission of felony murder." *Johnson*, at ¶53-57.

{¶ 39} Defendant LaPrairie likewise beat Julianna Berry to

death. He was charged with the offense of Child Endangering, R.C. 2919.22(B), and the offense of Involuntary Manslaughter, R.C. 2903.04(A), arising from committing the felony offense of Child Endangering. Under the rule of *Johnson,* it is possible to commit both offenses of which Defendant was convicted through the conduct in which Defendant engaged. Therefore, the two offenses are allied offenses of similar import for purposes of R.C. 2941.25(A). *Johnson*, at ¶48. The further issue is whether the exception to the merger requirement in R.C. 2941.25(B) applies.

{¶ 40} R.C. 2941.25(B) relieves the court of the merger requirement for allied offenses when the offenses were "committed separately or with a separate animus as to each." In the present case, the State argued that the offenses of Child Endangering charged in Count Four and the offense of Child Endangering that was the predicate felony for the offense of Involuntary Manslaughter charged in Count Five of the indictment were committed by Defendant with a separate animus as to each.

{¶ 41} The Supreme Court has held that, as it is used in R.C. 2941.25(B), "the term 'animus' requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct. In this sense, we believe that the General Assembly intended the term 'animus' to mean purpose or, more properly, immediate motive."

*State v. Logan* (1979), 60 Ohio St.2d 126, 131.

{¶ 42} The State argued that the Child Endangering offense that forms the predicate to the Involuntary Manslaughter offense in Count Five, which involved blunt force trauma to the child's head, was committed with an animus separate from the animus with which the Child Endangering offense in Count Four, which involved different, non-lethal injuries, was committed. However, the record fails to demonstrate that Defendant's purpose or immediate motive differed with respect to any of the injuries he inflicted. All were the result of multiple severe blows delivered separately to different parts of the child's body. One was fatal while the others were not. While the child's ordeal is heart-rending, no separate animus is demonstrated to distinguish one Child Endangering offense Defendant committed from the other.

{¶ 43} The State's contention more logically pertains to the alternative grounds in R.C. 2941.25(B): that the incidents constituting the two Child Endangering felonies in Counts Four and Five were "committed separately." Allied offenses are committed separately when the criminal behavior the offenses respectively involve is differentiated by time, place, or circumstance. When the behavior that allied offenses involve is instead part of a continuing sequence of interconnected acts or omissions, as in *Johnson*, the allied offenses are not committed

separately, even though each may involve discrete acts or omissions that produce different results.

{¶ 44} Having found that the two offenses to which Defendant pled guilty are not allied offenses per R.C. 2941.25(A), the trial court declined to consider the applicability of the exceptions to the merger requirement in R.C. 2941.25(B) on which the State had offered evidence.  In accordance with the disposition ordered in *State v. Craycraft*, __ Ohio St.3d __, 2010-Ohio-6332, the case will be remanded to the trial court to determine the applicability of the exceptions to merger in R.C. 2941.25(B) to the facts before it.

{¶ 45} As a final matter, we note that *Johnson* declined to apply the preemptive exception to the merger rule of *State v. Brown* regarding offenses for which the General Assembly intended to protect different societal interests, which the trial court applied in the present case.  *Johnson* involved the offenses of Endangering Children and Felony Murder, with Endangering Children as the predicate felony offense.  The present case involves Child Endangering and Involuntary Manslaughter, with Child Endangering as the predicate offense to Involuntary Manslaughter.  The only distinction between Felony Murder, R.C. 2903.02(B), and Involuntary Manslaughter, R.C. 2903.04(A), is in their predicate offenses.  Involuntary Manslaughter requires commission of a

felony that proximately results in a death. Felony Murder requires commission of an offense of violence which is a first or second degree felony that proximately results in a death. We see no distinction between the offenses and holding in *Johnson* and the offenses present case involves, at least with respect to the societal interests distinction in *State v. Brown*.

{¶ 46} *Johnson* was, as we have said, decided almost a year after the trial court's decision on the allied offenses question in the present case. The court acted correctly in applying the *Rance/Cabrales* test. Nevertheless, because *Johnson* was decided prior to our review of the error assigned in the present appeal, we are bound to follow and apply *Johnson*, which overruled *Rance*. In so doing, we necessarily find that the trial court erred when it found that the Child Endangering and Involuntary Manslaughter offenses of which Defendant was convicted are not allied offenses per R.C. 2945.21(A), and declined to consider the applicability of R.C. 2941.25(B), which establishes exceptions to the merger requirement.

{¶ 47} The first assignment of error is sustained.

SECOND ASSIGNMENT OF ERROR

{¶ 48} "THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS."

{¶ 49} Defendant was convicted on his pleas of no contest of Having Weapons Under Disability, R.C. 2923.13(A)(3), and Trafficking In Marijuana, R.C. 2925.03(A)(1). Defendant entered his no contest pleas following the trial court's denial of Defendant's Crim.R. 12(C)(3) motion to suppress evidence of the handgun and drugs police seized in their warrantless search of his home, to which Defendant had consented.

{¶ 50} Consent is not an exception to the Fourth Amendment warrant requirement fashioned out of exigent circumstances. Rather, consent to perform a search waives the warrant requirement of the Fourth Amendment, but only when the consent is freely and voluntarily given. Whether a consent to search is voluntary or a product of duress or coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. When the state relies on a consent to justify a warrantless search, the state must show by clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina* (1968), 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; *State v. Comen* (1990), 50 Ohio St.3d 206.

{¶ 51} When a consent is given following some form of illegal police action, the illegal action may be considered along with other circumstances in determining whether they combined to result

in coercion of the person who consented.  E.g., *Burrows v. Superior Court* (1974), 13 Cal.3d. 238, P.2d 590.  The question is said to be whether the consent was fatally tainted by the prior illegality under the "fruit of the poisonous tree" doctrine.  *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.  Then, it must be determined "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Id.*, 371 U.S. at 488.  LaFave writes:

{¶ 52} "While there is a sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." LaFave, Search and Seizure (Fourth Ed.), §8.2(d), p. 76.

{¶ 53} In *State v. Cheadle* (July 14, 2000), Miami App. No. 00CA03, we stated:

{¶ 54} "A warrantless entry and search of a private residence is presumptively unreasonable under the Fourth Amendment.  *Payton v. New York* (1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639;

*Welch v. Wisconsin* (1984), 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732. Invasion of the sanctity of the home is the chief evil against which the Fourth Amendment's warrant requirement is directed. *United States v. United States District Court* (1972), 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752. The burden is upon the government to overcome the presumption that warrantless searches of homes are per se unreasonable by demonstrating that the search falls within one of the few, well recognized exceptions to the warrant requirement. *Welsh v. Wisconsin, supra; State v. Kessler* (1978), 53 Ohio St.2d 204, 373 N.E.2d 1252.

{¶ 55} "One such exception to the warrant requirement is an entry or search based upon exigent circumstances. This exception is founded on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant. *Welch v. Wisconsin, supra.* In such emergency situations, police may have an urgent need to enter a home in order to protect persons or property, render emergency aid to injured persons, or prevent the imminent destruction of evidence. *Katz,* Ohio Arrest, Search and Seizure (1999), Chapter 10, pp. 177-187."

{¶ 56} Addressing the exigency involving the need to render emergency aid to injured persons, the United States Supreme Court has held:

{¶ 57} "'[T]he ultimate touchstone of the Fourth Amendment,' we have often said, 'is reasonableness.'" *Id.,* at 403, 126 S.Ct. 1943. Therefore, although 'searches and seizures inside a home without a warrant are presumptively unreasonable,' *Groh v. Ramirez,* 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (internal quotation marks omitted), that presumption can be overcome. For example, 'the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable.' *Mincey v. Arizona,* 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

{¶ 58} "*Brigham City*[1] identified one such exigency: 'the need to assist persons who are seriously injured or threatened with such injury.' 547 U.S., at 403, 126 S.Ct. 1943. Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' *Ibid.* This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. *Id.,* at 404-405, 126 S.Ct. 1943. It requires only 'an objectively reasonable basis for believing,' *id.,* at 406, 126 S.Ct. 1943, that 'a person within [the house] is in need of

---

[1] *Brigham City, Utah v. Stuart* (2006), 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650.

immediate aid,' *Mincey, supra,* at 392, 98 S.Ct. 2408.

{¶ 59} "*Brigham City* illustrates the application of this standard. There, police officers responded to a noise complaint in the early hours of the morning. 'As they approached the house, they could hear from within an altercation occurring, some kind of fight.' 547 U.S., at 406, 126 S.Ct. 1943 (internal quotation marks omitted). Following the tumult to the back of the house whence it came, the officers saw juveniles drinking beer in the backyard and a fight unfolding in the kitchen. They watched through the window as a juvenile broke free from the adults restraining him and punched another adult in the face, who recoiled to the sink, spitting blood. *Ibid.* Under these circumstances, we found it 'plainly reasonable' for the officers to enter the house and quell the violence, for they had 'an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning.' *Ibid.*" *Michigan v. Fisher* (2009), ___ U.S. ___, 130 S.Ct. 546, 175 L.Ed.2d 410, Slip. Op. No. 09-91, p.3.

{¶ 60} We glean from *Fisher* and the authorities it cites that, when relying on the emergency aid exception to the warrant requirement, the state assumes the burden to prove by clear and convincing evidence that officers were presented with a compelling need to enter a home or other private premises in order to provide

immediate aid to persons inside who were either  seriously injured or threatened with such injury.  Furthermore, the officers must have had an objectively reasonable basis for believing that such a need to enter presently exists.  A mere nexus to a need that formerly did exist is insufficient.

{¶ 61} In a motion to suppress, the trial court assumes the role of the trier of facts, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.  *State v. Clay* (1972), 34 Ohio St.2d 250.  Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.  *State v. Satterwhite* (1997), 123 Ohio App.3d 322.

{¶ 62} The trial court's findings of fact, in pertinent part, include the following:

{¶ 63} "The Court finds the testimony of the witnesses to be credible and finds the facts to be as follows.  On December 27, 2008 at approximately 10:00 a.m. a dispatch was made from the Fairborn Police Department to officers to proceed to 233 Pat Lane in the City of Fairborn, Greene County, Ohio, the nature of which was an injury to a child.  Officer Hiles and Officer Knapp of the

Fairborn Police Department arrived at 233 Pat Lane and based upon the dispatch entered the home without invitation or warrant. They observed a child in distress as well as an adult later identified as Brian LaPrairie. The officers immediately attempted rescue methods upon the child who appeared to be in serious condition.

In less than five minutes the officers heard the ambulance arrive and scooped up the child and carried the child outside for the purpose of transferring the child to medics who then removed the child from the scene by ambulance. At this point the officers who had little or no information regarding the name of the child, or the nature of the injury, re-entered the residence of 233 Pat Lane in order to engage Brian LaPrairie in a question and answer process to get information regarding the child and the nature of the child's distress which they were unable to do initially due to the condition of the child. The officers observed both the first time there in the house and the second time in the house that Brian LaPrairie was emotionally upset. During their conversations with him after entering the house the second time the Defendant was calming down and was able to provide information to the officers regarding the incident. Approximately fifteen minutes after the medics took the child, Officer Holcomb of the Fairborn Police Department arrived on scene to assist the other officers. It was during this time that the Defendant, Brian

LaPrairie, was asked questions by the officers and he volunteered information regarding the child. The Defendant while in his home was not under arrest and was not in custody. During this questioning the Defendant did not ask for an attorney nor did he ask the officers to stop asking him questions. While gathering this information about the child, the officers became concerned about the circumstances surrounding the injury to the child. After placing a call to their supervisor, the officers were instructed to inquire if the Defendant would consent to a search of the residence. The Court specifically finds that when the officers entered the home the second time to speak with the Defendant they were not pursuing a criminal investigation but concluding the ongoing emergency.

{¶ 64} "Officer Knapp went to his vehicle and obtained a consent to search form and re-entered the house where Officer Hiles and Officer Holcomb were still continuing to discuss the emergency circumstances with the Defendant after having entered the home the second time.

{¶ 65} "At approximately 10:52 a.m. Brian LaPrairie consented to a search of the residence. The consent form was signed by the Defendant and identified as State's Exhibit 1. The Court notes that no promises or threats were made before, during, or after the execution of the consent to search form. At this time the

Defendant still was not in custody or detention. The Court does find that the Defendant remained emotionally upset and distraught during this time period. Pursuant to the consent granted by LaPrairie, the residence at 233 Pat Lane was searched until approximately 12:10 p.m. when the search ended."

{¶ 66} Defendant concedes that Fairborn police officers had a legal justification to initially enter his home, as they were the first to respond to his 911 call for emergency medical assistance for two year old Juliana Berry. We agree that the exigent circumstances/emergency aid exception to the warrant requirement clearly justified the officers' initial entry into Defendant's home. *Mincey*. Defendant argues, however, that the officers' conduct in reentering his home and/or remaining inside his home after the child had been removed violated his Fourth Amendment rights. Because the officers' reentry was likewise performed without a warrant, or Defendant's express consent, it was the State's burden to prove by clear and convincing evidence that the officers were presented with a compelling need to act as they did.

{¶ 67} After the child had been removed from the home and transported to the hospital, Officers Hiles and Knapp re-entered Defendant's home to talk to Defendant and investigate what had happened to the child. While Officers Hiles and Knapp were inside

Defendant's home and talking to him about that, Officer Holcomb arrived and entered Defendant's home, approximately fifteen minutes after the child was taken to the hospital. When, after that, Officer Knapp called his supervisor for direction, he was advised to seek Defendant's consent to search his home. Officer Knapp then exited Defendant's residence and went to his cruiser and obtained a consent to search form, while Officers Hiles and Holcomb remained inside Defendant's residence, talking to him. Officer Knapp then re-entered Defendant's residence and presented the consent to search form to Defendant, which he signed while the three officers were inside his home.

{¶ 68} The trial court found that when the officers reentered Defendant's home "they were not pursuing a criminal investigation but concluding the ongoing emergency." However, the right of the officers to act for an emergency purpose must be strictly circumscribed by the exigency that existed. *Mincey v. Arizona*. To act as they did, officers must have had an urgent need to render aid to an injured person inside because of an "emergency threatening life or limb." *Id.*, 437 U.S. at 393. Furthermore, the need must be one based on objectively verifiable facts, and not a mere reasonable and articulable suspicion. Otherwise, the presumption that their warrantless entry was illegal is not overcome.

{¶ 69} The urgency that permitted officers to first enter

Defendant's home without a warrant because of the emergency need to aid the child dissipated after the injured child was removed from the home and transported by ambulance to a hospital. The child was then no longer an occupant of the home who was in need of immediate aid. *Mincey; Fisher.* The trial court found that the emergency nevertheless continued because of the officers' need to gather medical information concerning the child and to learn what had happened to her so they could pass that information along to the medics.

{¶ 70} Officer Hiles testified that officers reentered Defendant's home to question him because emergency medical personnel would have done that had they been able to remain on the scene. (T. at 26.) However, the record fails to demonstrate that the officers either determined what information paramedics wished to know or that the officers asked Defendant any questions concerning the child's pertinent past or present medical information. Neither did the officers make any effort to pass such information along to the paramedics or others who were responsible for treating and transporting the child to the hospital.

{¶ 71} Officer Knapp conceded that when officers reentered the home after the child had been removed, there was then no medical emergency for officers to act upon by going inside. (T. at 46.)

His supervisor, Captain Plemmons, testified that the officer who called him "was unsure of the situation and the nature of the call," and "I told them to go ahead and get a statement and a consent to search while I responded to the scene with the other Detective." (T. 60). Those matters undermine the attenuation of the emergency which the trial court found justified the officer's reentry into and continued presence inside Defendant's home after the child was removed.

{¶ 72} Upon reentering Defendant's home, Officer Hiles told Defendant that incidents such as this they treat as a crime scene. (Tr. at 18.) Officer Hiles testified "well, there's a death of a child, we have to investigate what happened." (Id. at 18-19.) When asked if the second time police went into Defendant's home they were there to get criminal information, Officer Knapp responded: "possibly. I don't know. We didn't know what was going on." (Id. at 58.)

{¶ 73} When considering the emergency aid exception to the warrant requirement, "[a]ny conduct within by the officer which is in any way inconsistent with the purported reason for the entry is a just cause for healthy skepticism by the court." LaFave, §6.6(a). At least by the time Defendant was presented with a consent form, the officer's continued and uninvited presence in Defendant's home had no tangible connection with an alleviation

of the emergency that had justified their initial entry. Therefore, on this record, the trial court's finding that when officers obtained Defendant's consent "they were not pursuing a criminal investigation but concluding an ongoing emergency" is against the manifest weight of the evidence. The officers' presence at that time, as well as the consent they obtained, was instead for purposes of a criminal investigation. Their continued presence in Defendant's home for that purpose, absent a warrant, was therefore in violation of the Fourth Amendment.

{¶ 74} The ultimate question is whether the illegality that the officers' presence involved rendered Defendant's consent to search less than knowing, intelligent, and voluntary. Concerning that issue, the trial court found:

{¶ 75} "The Defendant knowingly, intelligently, and voluntarily understood and signed the form and gave his consent to search. While the Court notes that the Defendant was upset emotionally during this time period, there is no evidence that this condition created any disability to the proper execution of the consent to search."

{¶ 76} We have held that even when a consent is not the product of some more specific coercion or duress, and therefore was voluntary in the usual sense, evidence seized in a search performed after the consent was given remains subject to suppression when

it was tainted by the fact of a prior illegal entry upon the premises that were searched. *Dayton v. Lowe* (Dec. 31, 1997), Montgomery App. No. 16458. "The question is whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" *State v. McGuire*, Montgomery App. No. 24106, 2010-Ohio-6105, ¶22, quoting *State v. Cooper*, Montgomery App. No. 20845, 2005-Ohio-5781, ¶28. "'[S]uppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the consents to search were given'; dissipation of the taint resulting from the illegal entry 'ordinarily involves some showing that there was some significant intervening time, space, or event.'" *United States v. Buchanan* (C.A. 6, 1990), 904 F.2d 349, 356, quoting *United States v. Vasquez* (C.A. 2, 1980), 638 F.2d 507-527-529, cert denied, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981).

{¶ 77} In the present case, the officers' initial entry into Defendant's home was, as we have held, justified by the emergency aid exception to the warrant requirement and therefore was not illegal. However, after that emergency had clearly dissipated and the officers then reentered Defendant's home, and then remained there, uninvited, in order to perform a criminal investigation, their continued presence was illegal. Absent some significant time, space, or event that intervened between that primary

illegality and the consent to search the officers obtained, the consent was tainted by the prior, primary illegality, and the search that was performed was likewise illegal.

{¶ 78} The consent form Defendant signed contains two notices that he may refuse to give his consent. Such notices may render a consent voluntary, in the usual sense. However, in order to be sufficiently significant to avoid the primary constitutional taint arising from the officers' illegal entry or presence on the premises as a matter of law, an intervening event should not itself be an element of the consent to which the taint attaches. The consent therefore remained tainted by the primary illegality when the consent was obtained by officers. Neither was the primary illegality itself avoided by the consent that was obtained, which appears to have been the purpose of obtaining it. Because the consent was tainted, the warrantless search and seizures performed on the authority of the consent were illegal. The trial court therefore erred when it denied Defendant's motion to suppress evidence.

{¶ 79} The second assignment of error is sustained.

## Conclusion

{¶ 80} Having sustained the first assignment of error, in part, we will remand the case to the trial court to determine the applicability of the R.C. 2941.25(B) exceptions to Defendant's'

convictions for Endangering Children and Involuntary Manslaughter, consistent with our Opinion.

{¶ 81} Having sustained the second assignment of error, we will reverse Defendant's convictions for Having Weapons Under Disability and Trafficking in Marijuana and will remand the case for further proceeding on those charges, consistent with our Opinion.

{¶ 82} The judgment of conviction from which the appeal was taken will otherwise be Affirmed.

FAIN, J., concurs.


FROELICH, J., concurring in part and dissenting in part:

{¶ 83} I agree with the majority that suppression is required "unless the taint of the unconstitutional entry has been dissipated" before the consent to search was given.

{¶ 84} I also agree that such dissipation "ordinarily involves some showing that there was some significant intervening time, space, or event."  I disagree that on the record before us we can determine, as a matter of law, whether the taint had dissipated.  The trial court did not make factual findings on this question since it found, incorrectly (we now hold), that the reentry and remaining in the house was constitutional as an exception to the warrant requirement.

{¶ 85} I concur on the remand for the court to determine the applicability of R.C. 2941.25(B), but also would remand for the court to decide, in light of our holding, whether the State has met its burden of demonstrating that the consent was voluntary.


Copies mailed to:

Elizabeth A. Ellis, Esq.
Thomas M. Kollin, Esq.
Hon. Stephen A. Wolaver